### Pacific Mut. Life Ins. Co. v. Fagan et al.

Dec. 1, 1942.

534

Hunt, Bush & Lisle for appellant.

Stoll, Muir, Townsend & Park and Charles R. Zimmer for appellees.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER
—Affirming.

On the evening of March 15, 1940, Edwin O'Hara Fagan, seventeen years of age, departed from his home in Lexington on a bicycle to visit a girl classmate a few miles distant on the Bryant Station Pike. He obtained a pistol at the home of a friend en route. While at the house of his classmate he made the statement that he had brought the pistol along for protection. At all times that evening he was in his usual good humor and made an engagement to meet the girl the next afternoon and evening. They also engaged themselves to attend a dance a few days later. About 12:30 o'clock A. M. he re-

turned to Lexington and stopped at the office of the Lexington Herald-Leader, a newspaper of general circulation. He and Dana Oliver, sixteen years of age, were distributors of papers for the Lexington Herald and worked together. About 4:30 o'clock A. M. they commenced delivering the papers and finished at about 7 o'clock. They then went to the Oliver home and, while waiting for Oliver to dress, Fagan slept about forty-five minutes in a chair. Between 9:30 and 10 o'clock that morning the boys went to Fagan's home where they ate breakfast. Fagan's parents had departed from the city earlier in the day. Fagan telephoned the girl whom he had visited the night before and according to the testimony was in a "cheerful mood, happy and laughing over the phone." He arranged details for meeting the girl that afternoon and evening. After finishing the telephone conversation he went upstairs to take a bath. Oliver followed, and the boys engaged in shooting at blackbirds. While thus engaged George Barker, a friend sixteen years of age, delivered a bottle of cream to the home, and, hearing the shooting directed his attention to the upstairs window where he saw Fagan leaning out with a pistol in his hand. Barker was a friend of the other boys and was invited to join them, which he did. The three fired the pistol until all of the cartridges had been exploded, whereupon they emptied the gun of all its shells. The revolver was of the swing cylinder type and contained nine chambers in its magazine. With the remark that he believed he had more shells in his drawer, Fagan crossed the hall into his own bedroom. He was followed by Barker who saw him standing by a desk "like he had just closed the drawer." he was holding the pistol in his hand. He twirled the cylinder, breached the pistol, and, pointing the gun at the ceiling, pulled the trigger twice on empty chambers. He again unbreached the pistol and said that he had "almost hit it that time." He again breached the pistol and laid it on the bed. Oliver testified he remained in the first bedroom to close the window and at about the time the gun was laid on the bed he appeared in Fagan's room. After engaging in conversation about trivial matters, Oliver mentioned the Russian-Finnish war and stated that he had read that Russian officers amused themselves by frequently placing a bullet in a gun, twirling the cylinder and pulling the trigger after having bet on the result of the folly. Fagan thereupon, laughing and joking, plac-

ed the gun to his head, and remarked "This is the way the Russians do when they don't want to go to war." He pulled the trigger twice in rapid succession, both times the firing pin fell on empty chambers. He thereupon pulled the revolver away from his head (some four or five inches) with an apparent intention to discontinue the demonstration; and, according to the testimony of Barker, he then tried to "steady himself." At that instant the firing pin struck a loaded cartridge causing it to explode; the bullet struck Fagan in the head resulting in his death two or three hours later. After the tragedy the revolver was examined and was found to contain two loaded and one spent cartridge.

At the time of the accident there was in full force and effect an accident insurance policy which had been issued by appellant, the Pacific Mutual Life Insurance Company, payable to Fagan's parents, appellees herein, insuring against loss "resulting directly or independently of all other causes from bodily injuries sustained (by the deceased) during the term of this policy and affected solely through external, violent and accidental means." The policy specifically excluded death caused by suicide. Upon appellant's denial of liability, this action was instituted by appellees to recover under the policy. Upon the trial a verdict was returned in favor of appellees in the sum of $5,000 and judgment entered thereon.

Appellant asserts two grounds for reversal, viz., (1) the court erred in refusing to instruct the jury peremptorily to return a verdict in its favor, and, (2) if not entitled to the peremptory instruction, the court erred in refusing to give instruction "A" offered by appellant. Appellant admitted the injury was effected through external and violent means but denied that it was accidental within the meaning of the policy. It was not contended by appellant that Fagan committed suicide but it argues that appellees failed to produce sufficient evidence to show that the death was the result of accidental means, and, since the burden of proof on this issue was upon appellees, appellant's motion for a peremptory instruction should have been sustained.

The meaning of the term "accidental means" has been exhaustively treated in the case of Donohue v. Washington National Insurance Company, 259 Ky. 611,

82 S. W. (2d) 780, 783, wherein quoting from 1 C. J. 427, it is said:

> " 'Where the effect is not the natural and probable consequence of the means which produce it— an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of the means, or *an effect which the actor did not intend to produce and which he cannot be charged with a design of producing*—it is produced by accidental means.' "
>
> (Emphasis ours).

In other words if something unforeseen, unexpected or unusual occurs in the act which precedes the injury it may then be said to have been produced by accidental means. The above cited rule seems to be given universal application and we think correctly so.

The question then resolves itself into whether the evidence was sufficient to support the theory of appellees, which was adopted by the jury, that Fagan's death was an "effect which the actor did not intend to produce and which he cannot be charged with a design of producing." It is unnecessary to determine whether the evidence is sufficient to support appellant's theory that death was not the result of accidental means. The proximate cause of the death was the explosion of the cartridge which emitted the bullet that entered decedent's body. Fagan's previous conduct in pulling the trigger on empty chambers did not cause any casualty, nor was it the proximate cause of the explosion of the shell that did produce death. It must be conceded that Fagan placed the gun in position that the bullet would enter his body if it exploded, but such act on his part would not produce any injury had the explosion not occurred. It is true that the jury might take into consideration the fact that he had repeatedly pulled the trigger immediately before the shell exploded in its determination of the question as to whether he intended to snap the firing pin on the loaded shell, but such previous conduct is not conclusive of that fact. If he had intended to fire a loaded shell from the position the gun was in at the time he was killed, undoubtedly, his death would have resulted from suicide. He knew, or had momentarily forgotten, that there were three loaded shells in the magazine, because, after firing at the blackbirds he emptied the

revolver and from that time until the fatal shot was fired it was in his, and no one else's possession. That evidence is conclusive of the fact that he placed the three loaded cartridges in their respective chambers. That he had momentarily forgotten he had placed the loaded shells in the revolver is not an unreasonable inference to be drawn from the evidence that he had a bare forty-five minutes sleep in the thirty hours preceding his death. Likewise, it would not be unreasonable to infer from the evidence that Fagan, immediately before the fatal accident, had lost his balance, and, in "steadying himself," accidentally discharged the gun. In either of these events, his death would have been an effect which he did not intend to produce and which he cannot be charged with a design of producing. It would be difficult to conclude from his demeanor of the night before and up to the very moment the fatal shot was fired, that he had the intention of committing suicide. All of the witnesses who knew him testified that he was an unusually cheerful person. The night before the accident he called upon the girl with whom he had been keeping company steadily for several months. She testified that he was in his usual good spirits. He was sufficiently interested in enjoying life to have called her almost immediately before his death and arrange the details of their engagement for the afternoon and evening. He was laughing and joking at the very instant of the explosion of the fatal shell. Such conduct and frame of mind are totally inconsistent with the theory of suicide. Whilst it must be conceded that the absence of suicidal intent does not in all cases necessarily establish the fact that the decedent came to his death by accidental means, nevertheless, the facts and circumstances proven in this case authorize a finding of no other alternative. Both of Fagan's companions at the time of the accident testified that, when the pistol fired, the victim was in the act of taking it away from his head and that his action in doing so manifested to them his intention to discontinue the demonstration of "how the Russians do when they don't want to go to war." Dana Oliver testified:

"* * * He pulled the trigger twice in succession—there was no difference in the two times. After the second time it snapped he seemed to be drawing it away from his head and there was a distinct pause and then the gun went off."

Barker testified:

"Q. I believe I asked you how far this pistol had been pulled away from Pat's (Fagan's) head before it went off? A. I would say about four or five inches, not any more. He clicked it two times, once or twice before he started to pull it away, and then it went off.

"Q. Where was the pistol pointed to, how close to his head when he snapped it the two times you have testified about? A. It was very close to his head then, about here (indicating temple on right side) then he pulled it away.

"Q. When the pistol went off, or rather before that, say from the time that Pat first took it up and put it to his head, what was his manner and how was he handling the pistol? Just how did he handle the pistol from the time he picked it up there until it went off? A. Just as usual, kind of joking and laughing.

"Q. Was he laughing out loud? A. About as he usually did, first laugh and then say something funny, and then smile.

"Q. Did you see any change in his appearance at all, did he continue to laugh? A. His expression did not change until after the shot was fired, after it went off.

"Q. What did you see then, what did you notice as to his expression? A His expression changed from a smile to a look of surprise—he seemed surprised.

"Q. What did he do then? A. After the shot was fired, his expression changed to this surprised look and he stood there for a moment and then dropped to the floor."

We think it cannot seriously be contended in considering the evidence recited above that it was not sufficient to submit the question of accidental death to the jury and to support the verdict based thereon. As said in Travelers Insurance Company v. Mahon, 273 Ky. 691, 117 S. W. (2d) 909, 912,

"It is an established rule that where there is any evidence, * * * a peremptory instruction should not be given, but a verdict should only be directed per-

emptorily when after admitting all the evidence for the plaintiff to be true as well as reasonable inferences therefrom there has been a failure to establish a case.''

''Instruction No. 1. If you believe from the evidence that the death of the insured, Edwin Therefore we are of the opinion that the court did not err in overruling appellant's motion for a directed verdict.

We now pass to a consideration of the complaint of the instructions. The instructions complained of are in the following words:

O'Hara Fagan, resulted directly and independently of all other causes from bodily injuries towit: a pistol wound in the head, effected solely through accidental means, then you will find for the plaintiff in the sum of $5,000.00, with interest thereon at the rate of 6 per cent per annum from March 16th, 1940, until paid; but unless you so believe you will find for the defendant.

''Instruction No. 2. For the jury to find that the death of Edwin O'Hara Fagan was effected through 'accidental means' they must find that in the act which preceded the injury something unforeseen, or unexpected or unusual occurred which produced the injury.''

The complaint is that the instructions are too general to aid the jury in applying the law to the peculiar evidence in this case. Instruction A, offered and refused, and which it is now insisted the court should have given, is in the following language:

''For the jury to find that the death of Edwin Fagan was effected through 'accidental means,' they must find that in the act which preceded the injury something unforeseen or unexpected or unusual occurred which produced the injury; and there is a clear distinction between 'accidental means' and 'an accidental result.' And if the jury believe from the evidence that Edwin Fagan placed the pistol mentioned in the evidence to his head and pulled the trigger, and that at the time he knew that there were cartridges in the cylinder of the pistol and that the pulling of the trigger might cause the pistol to fire, then the firing of the pistol was not an accident

and the death of Edwin Fagan was not due to 'accidental means'; and if the jury believe from the evidence that the death of Edwin Fagan occurred in the manner and from the causes above defined, then the law is for the defendant and the jury will so find.''

As we have hereinbefore indicated the question for the jury to determine in this case was whether Fagan came to his death as the result of an act which he did not intend to produce and which he cannot be charged with the design to produce. If so, the firing of the loaded shell was something unforeseen or unexpected or unusual in the circumstances surrounding the events which immediately preceded his death. The instructions given clearly point out to the jury that the unforeseen, unexpected or unusual occurrence must have attached itself to the act which produced the injury and not to the result obtained by the act. That is the distinction appellant has asked to be made by offering instruction A and we think it is as clearly and perhaps more succinctly stated in the instruction given by the court. We are of the opinion, as the court said in commenting on a similar instruction in Travelers' Insurance Company v. McInerney, Ky. 119 S. W. 171, 173, ''These instructions are models of brevity and simplicity, and are certainly as favorable to appellant as it was entitled to have.''

Where the instructions given embrace all the law of the case one has no just cause of complaint because the court refuses to amplify the law so given by reference to specific evidence to which the law must be applied. City of Richmond v. Martin, 78 S. W. 219, 25 Ky. Law Rep. 1516; Louisville & N. R. Co. v. Hall, 273 Ky. 590, 117 S. W. (2d) 571.

The judgment is accordingly affirmed.

The whole court sitting.